IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civil No. 1:21CV44 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| $59,980.00 in U.S. CURRENCY, | : | |
| | : | |
| and | : | |
| | : | |
| $30,000.00 in U.S. CURRENCY, | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT OF FORFEITURE

NOW COMES the plaintiff, United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and respectfully states as follows:

1. This is a civil action *in rem* brought to enforce the provisions of 21 U.S.C. § 881(a)(6) for the forfeiture of the defendant properties, which were furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, or represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate violation of the Controlled Substance Act.

2. This action is also brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of the aforesaid defendant properties which constitute or were derived from proceeds traceable to an offense constituting specified unlawful activity

- 1 -

as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense, including, but not limited to, the exchange of a controlled substance in violation of state and federal law.

3. The defendant properties are $59,980.00 in U.S. Currency, and $30,000.00 in U.S. Currency, which were seized on July 21, 2020, from Dennis Dang (a/k/a Dennis Dung Ngoc Dang) in Burlington, North Carolina, and is currently in the custody of the United States Marshals Service.

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant properties. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395, because the defendant properties were seized while located in the jurisdiction of this Court, or one or more of the acts giving rise to forfeiture occurred in this district.

6. Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the properties pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

7. The facts and circumstances supporting the seizure and forfeiture of the defendant properties are contained in Exhibit A, attached hereto and wholly incorporated herein by reference.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the defendant properties; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

This the 15th day of January, 2021.

Respectfully submitted,

MATTHEW G.T. MARTIN
United States Attorney


 /s/ Nathan L. Strup
Nathan L. Strup, Mo. Bar No. 60287
Assistant U.S. Attorney
Middle District of North Carolina
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
(336) 333-5351/nathan.strup@usdoj.gov

# VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

_____
Kevin Cornell
Task Force Officer
Drug Enforcement Administration

## DECLARATION

I, Kevin Cornell, Task Force Officer with the Drug Enforcement Administration (DEA), Greensboro, North Carolina, hereby state, pursuant to 28 U.S.C. § 1746, under penalty and pursuant to the laws of the United States, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a federal law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 21, United States Code.

2. I have been a Task Force Officer with DEA since May 2005, and am currently assigned to the Greensboro Resident Office. I have been a sworn Deputy Sheriff with the Guilford County Sheriff's Office (GCSO) since July 1998. I have been a Detective with the Special Operations Division - Vice/Narcotics Unit (Vice Unit) since April 2004, and in May 2012 was promoted to the rank of Detective Sergeant supervising the Special Operations Division - Specialized Enforcement/Criminal Interdiction Unit.

3. This declaration is submitted in support of a Verified Complaint of Forfeiture for $30,000.00 in U.S. currency and $59,980.00 in U.S. currency seized on July 21, 2020, from the possession of Dennis DANG.

4. The facts and circumstances set forth in this Declaration are based upon information provided by other law enforcement officers and my own personal knowledge and experience. Because this declaration is being submitted for the limited purpose of


GOVERNMENT EXHIBIT
A

establishing probable cause, I am not including all the facts and information that I have learned about or obtained during the course of this investigation.

5. Since May of 2020, agents and officers from the Drug Enforcement Administration (DEA) Greensboro Resident Office (GRO) and Homeland Security Investigations (HSI) Raleigh Resident Agent in Charge (Raleigh RAC) have been conducting an investigation involving Drug Trafficking Organizations (DTO) utilizing legitimate armored car services to transport drug proceeds across the United States. Through this investigation, agents and officers began obtaining subpoenaed records from a company called Malca-Amit USA, LLC (Malca-Amit) which is self-described as a global secure logistics provider, specializing in door-to-door shipping within the diamond and jewelry, and watch and precious metal markets. Additionally, throughout this investigation, DEA and HSI were made aware of other federal seizures of bulk U.S. currency on the East Coast related to contracted pick-ups of "gold jewelry" by Malca-Amit on behalf of a company identified as C.C.L. Heng Inc.

6. On July 20, 2020, HSI Raleigh RAC received information that C.C.L. Heng Inc. had scheduled a package pick-up with Malca-Amit in Burlington, North Carolina, for 3:00 p.m. that afternoon. The scheduled pick-up was for six (6) lbs. of "gold jewelry" to be shipped by Malca-Amit from a particular location in Burlington, North Carolina, to C.C.L. Heng Inc. in Los Angeles, California. The customer shipping receipt listed "Dennis Dung Ngoc DANG" as the person shipping the package from Burlington, North Carolina.

7. HSI agents later learned that an off-duty officer (hereinafter referred to as "AL"), working for Orion Security, was scheduled to pick-up the package on behalf of

Malca-Amit, but that he later refused the contract. I contacted AL about the contract and his knowledge of previous pick-ups from this location. AL stated that he refused the contract by Orion Security because he was suspicious the previous similar pickups he had made were not "gold jewelry" as described on the shipping documents and most likely involved some type of contraband that he didn't want to be involved with. AL stated he had conducted at least five (5) contracted pick-ups of "gold jewelry" since March of 2020 from DANG at his place of business located in Burlington, North Carolina, which is described by AL as a tanning salon which appeared to have no affiliation or association with a jewelry store. As a result, AL declining the July 20, 2020 contract due to his suspicions criminal activity was occurring, the pick-up was rescheduled for the following afternoon on July 21, 2020, at 3:00 p.m.

8. On July 21, 2020, HSI Special Agent (SA) Bell, HSI, SA Mclane, myself, DEA GS D. Jenkins, and law enforcement officers from the Alamance Narcotics Task Force (ANET) met to discuss conducting a knock and talk at DANG's place of business in Burlington, North Carolina, and to speak with DANG about the package he scheduled for pick-up by Orion Security on behalf of Malca-Amit.

9. Later that day, at approximately 1:00 p.m., SA Bell and SA Mclane entered the tanning salon and immediately encountered DANG inside the business. I was at the scene and did not enter the business at that time. SA Bell asked DANG about the outbound package that he had scheduled for that afternoon. DANG looked at SA Bell's and SA Mclane's Raleigh-Durham International Airport (RDU) law enforcement officer identification badges and retrieved a clear, taped closed, white mail parcel box from behind

3

the counter and placed the box on top of the counter. SA Bell asked DANG if he had the packaging material to ship the package and DANG stated that he did not. At that time, SA Mclane went outside and requested that I enter the business, which I then did.

10. SA Bell and SA Mclane next identified themselves as HSI special agents to DANG and asked DANG about the contents of the package. SA Bell stated that the shipping receipt stated that the package contained six (6) lbs. of "gold jewelry" and asked DANG if it in fact contained gold jewelry. DANG responded that the package did not contain gold jewelry and that it was "cash." DANG stated that he was planning to buy gold jewelry, that the cash in the box was his, and that he was sending the cash to Los Angeles, California in return for the gold jewelry. SA Bell asked DANG if he would open the box and show agents the contents of the parcel. DANG agreed to allow agents to open the parcel. DANG then gave me a pair of scissors to open the package. Inside the box were two vacuum-sealed bundles of bulk U.S. currency.

11. At that time, I asked DANG if it was ok if I brought in my police canine (Maggie) to conduct a sniff of the parcel, and DANG agreed. Canine Maggie was brought into the business. I directed Canine Maggie to conduct an open area search of the business lobby and the opened package provided by DANG, which was placed on the floor. Canine Maggie positively alerted to the odor of narcotics from the package. The package was seized, and later determined to contain $59,980.00 in U.S. currency. DANG was provided a receipt for the seized U.S. currency.

12. SA Bell and SA Mclane asked DANG how many times he had shipped these packages to C.C.L. Heng Inc. in Los Angeles, California. DANG stated that he may have

4

done it one (1) or two (2) times prior to this incident. SA Bell asked DANG where he received the bulk U.S. currency. DANG stated that the cash in the package was his and that he took it out of the bank last month as a result of his "COVID Loan." SA Bell again asked DANG how many times he had shipped these packages to C.C.L. Heng Inc. in Los Angeles, California, in this manner and he stated that it was just one (1) or two (2) times prior to that. SA Bell advised DANG that agents knew he had done this on numerous occasions and at least five (5) or six (6) times since March of 2020. DANG admitted that he had shipped packages to C.C.L. Heng Inc. in Los Angeles, California, in this manner on numerous prior occasions, and that an unidentified white male would drop off the bulk U.S. currency at the tanning salon. DANG would take the money home where he would package and vacuum seal it for shipment to C.C.L. Heng Inc. in Los Angeles, California. SA Bell asked DANG how he got involved in this and he stated that an individual named "MINH" in Charlotte, North Carolina is the one who recruited him to do this and that he only knows and communicates with MINH via Facebook Messenger. DANG repeatedly stated to agents that he was "scared" and that "he didn't know what he had gotten himself into."

13. DANG stated that on previous occasions the unidentified white male would drop off the bundles of bulk U.S. currency, but on this occasion the cash in the box was his and that it was from his "COVID Loan." SA Bell asked DANG to pull up his banking records so agents could see the transactions. SA Bell took photos of DANG's cell phone where he showed that on June 23, 2020, DANG's Bank of America account received a $58,100.00 deposit from "SBAD TREAS." DANG's Bank of America account also showed that on June 29, 2020 there were two customer withdrawals from this account,

5

$25,000.00 and $30,000.00. I asked DANG how much money was in the package and DANG stated it was $20.00 off from $60,000.00 ($59,980.00), and DANG stated he personally counted the money, and then vacuum-sealed the money so it didn't move around in the box.

14. SA Bell asked if DANG would provide agents with consent to search his house with a police canine. DANG agreed to take agents to his house and to allow a canine search of his residence. SA Bell advised DANG he was detaining his cell phone while in route to DANG's residence. Prior to departing the tanning salon, DANG returned to the business and instructed his employee to call his wife. SA Bell entered the business at the end of the conversation but did not hear the entire conversation between DANG and the employee.

15. DANG provided written consent for his residence to be searched. DANG told me that his wife had money from her savings in her room, but that he didn't know exactly where it was located since she hides it from him. At that time, DANG received a phone call from his wife. DANG placed the call on speaker phone and asked his wife if she had anything in the house. DANG's wife stated that she had her savings in her closet and that she had her "loan money."

16. Upon arrival at the residence, I instructed Canine Maggie to conduct an open area search of the interior of the residence and identified two areas where Canine Maggie exhibited a significantly noticeable change in her behavior, but a positive alert was not specifically observed. The first location was an office off the main entry where a box of

6

latex gloves along with numerous new/unassembled white mail parcel boxes identical to the one located at the business that contained the $59,980.00 in U.S. currency.

17. The second location Canine Maggie exhibited a noticeable change in her behavior was in the area of the master bedroom where SA Bell located a cardboard box on the floor behind the TV stand containing $30,000.00 in U.S. currency. The currency appeared to be money withdrawn from a bank as it exhibited paper bank straps with date stamps. Additionally, during further search of the master bedroom closet I located a ziploc bag of U.S. currency, estimated to be less than $1,000.00, hidden in DANG's wife's closet that Canine Maggie did not exhibit any interest in.

18. DANG stated that that the bulk $30,000.00 in U.S. currency found in the residence behind the TV stand was in fact the "loan money" that he withdrew from the bank on June 29, 2020, and not the bulk U.S. currency that was found in the mail parcel at the business that was being shipped to Los Angeles, California.

19. Regarding his prior shipments of currency to C.C.L. Heng Inc. in Los Angeles, California, DANG refused to provide agents with an excuse for why he was involved with the money laundering activity and simply stated that he was "afraid."

20. DANG did not provide any further statements to law enforcement at that time and suggested that maybe he needed to speak with a lawyer first, at which point specific questioning related to the incident by law enforcement stopped.

21. In October of 2005, I was selected by the Guilford County Sheriff's Office to be the canine handler for Canine Cozmo and we were assigned to the GCSO Vice / Narcotics unit primarily conducting criminal interdiction with the Greensboro DEA Task

Force. Canine Cozmo and I were a certified narcotics detection team through the North America Police Work Dog Association for approximately 8.5 years until Canine Cozmo was taken out of service in January of 2014 for health issues. Canine Cozmo and I were credited with locating over eight thousand (8,000) pounds of illegal narcotics and over $4,000,000 in bulk U.S. currency while conducting criminal interdiction investigations and assisting in various local, state and federal narcotics investigations.

22. In February of 2014, the Guilford County Sheriff's Office purchased Canine Maggie from Shallow Creek Kennels in Sharpsville, Pennsylvania, as a replacement for Canine Cozmo. I was selected to be the handler. Canine Maggie is a female Belgium Malinois, a breed specifically selected for their keen senses and ability to be trained to detect the odor of controlled substances. Canine Maggie underwent a two-week initial training period at the Guilford County Sheriff's Office canine facility conducted by senior canine handlers Master Corporal E. Stanley and Corporal D. Thompson. We participated in a one-month training period under the indirect supervision of Master Corporal E. Stanley and Corporal D. Thompson. During this training period, Canine Maggie proved that she could reliably use her olfactory senses to locate narcotic training aids of actual controlled substances which include Heroin, Cocaine (HCl and Base), Marijuana / Hashish, and Methamphetamines. After successful completion of this training, Canine Maggie was entered into service with the Guilford County Sheriff's Office – Special Operations Division as a narcotics detection canine.

23. Canine Maggie and I were originally certified as a Narcotics Detection Team by the North American Police Working Dog Association in the detection of Marijuana,

Cocaine, Heroin, and Methamphetamines on March 28, 2014. Canine Maggie and I certify annually as a Narcotics Detection Team with the North American Police Working Dog Association, the most recent certification being on September 18, 2020. This certification is valid for one year from the date of issuance.

24. Canine Maggie is trained to "Passively Alert" after detecting the odor of narcotics for which she has been trained. This "Passive Alert" consists of a physical reaction which ultimately ends in her coming to a sitting and/or laying position when the odor of narcotics for which she is trained is detected. Canine Maggie also exhibits various mental and physical reactions which I am familiar with as noticeable changes in her behavior such as becoming possessive of the area, a refusal to leave an area where the odor of narcotics is detected and changes in her breathing rate and sniffing patterns.

25. Canine Maggie undergoes frequent training for the detection of concealed controlled substances, which is on-going in order to ensure her proficiency. I have attended numerous seminars / training sessions sponsored by various professional organizations such as; the North American Police Working Dog Association (NAPWA), National Criminal Enforcement Association (NCEA), United States Police Canine Association (USPCA) and others, which have exposed him to basic and advanced narcotic concealment methods, narcotics detection issues, training and animal behavior. I also frequently consult various periodicals to stay informed about current trends utilized by narcotics traffickers to include advanced narcotic concealment methods.

26. I have successfully demonstrated the ability to properly deploy and maintain a police narcotics canine and effectively locate controlled substances with the assistance of

9

Case 1:21-cv-00044   Document 1-1   Filed 01/15/21   Page 9 of 11

Canine Maggie that have been concealed in a variety of locations since being placed into service. Canine Maggie and I have assisted various local, state and federal law enforcement officers in numerous narcotics investigations.

27. On July 22, 2020, the U.S. currency was transported to Loomis Fargo located in Durham, North Carolina, and was confirmed to be a total of $89,980.00. The U.S. currency was deposited electronically via Loomis to the U.S. Marshal Service Seized Assets Deposit Fund.

28. DEA began administrative forfeiture proceedings. Notice of the forfeiture proceeding was published on an official government internet site (www.forfeiture.gov) from September 28, 2020, to October 27, 2020.

29. On October 19, 2020, DEA received two separate claims from DANG, one claim to the $30,000.00 in U.S. currency and the other claim to the $59,980.00 in U.S. Currency. In both claims to the DEA, DANG stated that he owned 100% of the currencies. DANG further stated in both claims that the currencies were from two sources: (1) a Small Business Administration loan in the amount of $58,100.00, that he had received on June 23, 2020, and (2) the March 1, 2017 sale of a tanning salon located in Burlington, North Carolina, that he owned for $46,000.00. DANG stated in both claims that he "took the currency from the sale of the [tanning salon] and from his disbursement from the SBA loan and divided the money up" and that he "then put part of the money at his home and part at his business to ensure that he would retain some of the money if he was robbed."

30. Upon receipt of the claims, the administrative forfeiture process was terminated, and the seizure was referred to the United States Attorney's Office for judicial forfeiture.

## CONCLUSION

31. Based on the foregoing, there is probable cause to believe that the $30,000.00 in U.S. currency and $59,980.00 in U.S. currency, was furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, or represents proceeds traceable to such an exchange, and is therefore subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

This the 15 day of January, 2021.

*[signature]*

Kevin Cornell
Task Force Officer
Drug Enforcement Administration